159 F.3d 470
 14 NDLR P 23, 98 Cal. Daily Op. Serv. 8271,
98 Daily Journal D.A.R. 11,480
 SAN PEDRO HOTEL CO., INC., a California corporation; John
Fentis, as trustee for the Fentis Family Marital Trust B;
John M. Fentis, an individual; Pearle Fentis, an
individual; Maria C. Fentis, an individual; John Fentis,
as Trustee for the Fentis Family Survivor's Trust,
Plaintiffs-Appellants,
v.
CITY OF LOS ANGELES, a California municipal corporation;
Rudy Svorinich, Jr., an individual, Defendants-Appellees.
SAN PEDRO HOTEL CO., INC., a California corporation; John
Fentis, as trustee for the Fentis Family Marital Trust B;
as Trustee for the Fentis Family Survivor's Trust, and as an
individual: Pearle Fentis; Maria C. Fentis, Plaintiffs-Appellants,
v.
CITY OF LOS ANGELES, Defendant-Appellee.
 Nos. 96-56627, 97-55053.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 5, 1998.
Decided Nov. 6, 1998.
 
 William J. Davis, Amanda Vu Dwight (on briefs), Davis & Company, Irvine, CA, for plaintiffs-appellants.
 Jess J. Gonzalez, Deputy City Attorney, Los Angeles, CA, for defendants-appellees.
 Appeals from the United States District Court for the Central District of California Harry L. Hupp, District Judge, Presiding. D.C. No. CV-96-02325-HLH.
 Before: WALLACE, TROTT and HAWKINS, Circuit Judges.
 MICHAEL DALY HAWKINS, Circuit Judge:
 
 
 1
 The San Pedro Hotel Company, Inc. and its owners, the Fentis family (collectively the "Fentises"), appeal the district court's dismissal of their action alleging claims under the Fair Housing Act (42 U.S.C. §§ 3601-3631), 42 U.S.C. § 1983, state tort law, and tortious interference with prospective economic advantage. The Fentises allege the City of Los Angeles and an individual councilman (collectively the "City") discriminated against the mentally ill by interfering with the Fentises' sale of their hotel for the development of housing for the mentally disabled.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 The Fentises owned a property in the San Pedro district of Los Angeles known as the "California Hotel." In June 1994, the Fentises entered into an agreement to sell the California Hotel to A Community of Friends ("ACOF"), a not-for-profit developer of housing accommodations primarily used to house the mentally disabled. The sale of property was contingent upon ACOF obtaining federal financing and an award of tax credits from the California State Tax Credit Allocation Committee.[1]
 
 
 3
 Although the money was to come from federal coffers, the City of Los Angeles was ultimately responsible for approving or rejecting the $1.3 million rehabilitation and acquisition loan to ACOF. Sometime after the proposed sale became public, several local groups, including the San Pedro Chamber of Commerce, expressed their opposition to the proposed redevelopment. The Fentises allege that this opposition had some influence upon Los Angeles City Councilman Rudy Svorinich, Jr. ("Svorinich"), councilman for the San Pedro area and Chairperson of the Housing and Community Redevelopment Committee of the Los Angeles City Council (the "Committee"). The Committee generally reviews proposed loans of this type and recommends to the City Council whether to approve such loans.
 
 
 4
 On December 6, 1995, after reviewing the proposed San Pedro project,[2] the Committee passed upon but did not recommend approval of the loan to ACOF.[3] The Committee stated no reasons for its actions, but has subsequently stated that it held up the loan recommendation pending resolution of several issues (e.g., conformance with local community plan; educational links between the project and the community; and increased local community support).
 
 
 5
 Shortly after the Committee failed to recommend approval of the loan, John Fentis, as family spokesman, was quoted in a San Pedro newspaper as stating that the City had acted illegally by refusing to fund housing for the mentally ill and that his family would sue to obtain approval of the ACOF loan. Several weeks later, in early February, the City of Los Angeles Building and Safety Commissioner and several members of the City's "Slumhouse Task Force"[4] conducted an inspection of the California Hotel.[5] The investigators cited the Fentises for numerous building code violations in response to which the Fentises spent some $40,000 making repairs.[6]
 
 
 6
 The Fentises' attorney then sent a letter to the entire City Council reiterating his clients' intention to sue the City to approve funding for the project. Receiving no satisfactory assurance that the City would approve the loan, the Fentises filed suit against the City and Svorinich. The complaint, filed one month after the Slumhouse Task Force inspection, alleged violation of the federal and state fair housing acts as well as constitutional claims. In addition to damages, the Fentises requested that the City and Svorinich be enjoined from interfering with the funding of a home to be used by the mentally ill.
 
 
 7
 Shortly after the filing of the complaint, the City re-inspected the California Hotel. In addition to finding that the Fentises had not made "substantial progress" on previously cited problems, the investigators cited the Fentises for several new violations. At about the same time the City charged the Fentises with criminal slum offenses.[7]
 
 
 8
 The Committee recommended approval of the ACOF loan shortly after which the full City Council approved the loan. ACOF then applied for and received a tax credit award adequate to complete the acquisition and renovation of the California Hotel as housing for the mentally disabled. As a result, the sale of the California Hotel to ACOF closed six months after the City's approval of the loan.
 
 
 9
 The Fentises elected to go forward with their claims notwithstanding the loan approval. On June 3, 1996, the district court dismissed the majority of the Fentises' complaint.[8] The district court ruled that the Fentises had no standing to complain of the interference by the City with the sale and renovation of the California Hotel either for damages or equitable relief. Believing that the Fentises might have standing to state a cause of action for retaliation under the Fair Housing Act, see 42 U.S.C. § 3617, the district court allowed the Fentises to amend their complaint to properly state a retaliation claim. In addition, the district court held that Councilman Svorinich was entitled to absolute immunity for his actions "as a councilman voting or persuading his colleagues to vote one way or another on approval of the loan to ACOF."
 
 
 10
 Over the next several months, the Fentises twice amended their retaliation claims. In response, Svorinich moved for and was granted summary judgment on the retaliation claim against him. At the same time, the district court dismissed the retaliation claim against the City with leave to amend and placed the City's motion for summary judgment on that claim "off calendar subject to later renewal."
 
 
 11
 After the Fentises had filed their second amended complaint, the City filed a Rule 12(b)(6) motion to dismiss (failure to state a claim). Attached to this motion was a memorandum of points and authorities in support thereof. Unlike the motion itself, this document also included, in parenthesis, the words "renewal of previously filed motion for summary judgment." The Fentises filed an opposing brief listing only the 12(b)(6) motion. The Fentises attached over 400 pages of documents to their brief. The City filed a reply brief in which it described its motion as a "motion to dismiss or in the alternative for summary judgment."
 
 
 12
 Although the City failed to comply with the Local Rules regarding summary judgment (e.g., it offered no "Statement of Uncontroverted Facts and Conclusions of Law" or proposed order as Local Rule 7.14.1 requires) on this motion, it had complied with those rules on its earlier summary judgment motion which it now sought to renew. In addition, the district court informed the Fentises that it had read the documents they submitted as part of their brief. The district court then denied the City's motion to dismiss, but granted its motion for summary judgment.
 
 
 13
 The Fentises appeal the five separate district court orders which, together, dismissed their entire lawsuit. The Fentises separately appeal the denial of their motion for costs and attorneys' fees as a prevailing party under 42 U.S.C. §§ 1988 and 3613(c), as well as under state law. That appeal has been consolidated with the Fentises' earlier appeal and all of the Fentises' claims are now before this court.
 
 
 14
 We affirm in part, reverse in part, and remand.
 
 ANALYSIS
 
 15
 * We review de novo the district court's conclusion that the Fentises did not have standing to sue under the Fair Housing Act, 42 U.S.C. §§ 3601-3631 (the "Act").[9] See Johns v. County of San Diego, 114 F.3d 874, 876 (9th Cir.1997). We hold that this ruling was incorrect as a matter of law.
 
 The Act makes it unlawful to:
 
 16
 discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, a person residing or intending to reside in that dwelling after it is sold, rented or made available, or any person associated with that buyer or renter.
 
 
 17
 42 U.S.C. § 3604(f)(1). This act applies to municipalities, see Keith v. Volpe, 858 F.2d 467 (9th Cir.1988), as well as to health, safety, and land use regulations and policies. The Act provides for a private claim to those who are "aggrieved" by discriminatory conduct. 42 U.S.C. § 3613.
 
 
 18
 The Supreme Court has long held that claims brought under the Act are to be judged under a very liberal standing requirement. Unlike actions brought under other provisions of civil rights law, the plaintiff need not allege that he or she was a victim of discrimination. See Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 115, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (holding that Caucasian residents have standing under the Act to challenge racial discrimination against African-Americans in their neighborhood). Rather, the sole requirement for standing under the Act is the "[Article] III minimia of injury in fact." Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). To meet this requirement, a plaintiff need only allege "that as a result of the defendant's [discriminatory conduct] he has suffered a distinct and palpable injury." Id. (quotation and citation omitted).
 
 
 19
 Under the Act, any person harmed by discrimination, whether or not the target of the discrimination, can sue to recover for his or her own injury. See Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). This is true, for example, even where no housing has actually been denied to persons protected under the Act. See Smith v. Stechel, 510 F.2d 1162, 1164 (9th Cir.1975) (real estate agent fired for renting apartments to minorities allowed to sue under the Act).
 
 
 20
 In concluding that the Fentises lacked standing, the district court expressed concern over the "tenuous" connection between the Fentises and the individuals protected under the Act--the mentally ill who were to move in to the California Hotel only after it was sold and refurbished. Contrary to the district court, we believe that the Act "does not restrict the right to bring an action to persons 'associated with' a handicapped person, but rather allows anyone sustaining an actual injury from an alleged discriminatory housing practice to commence a suit." Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1282 n. 7 (3d Cir.1993) (corporation which provides community living arrangements for the mentally ill has standing to bring suit under the Fair Housing Act for county's alleged discriminatory refusal to assume its leases). Thus, to establish standing under the Act, all the Fentises need show is that the City interfered with the housing rights of the mentally ill and that, as a result, the Fentises suffered an actual injury.
 
 
 21
 As potential sellers of the property who were unable to sell their property to a buyer because of the City's allegedly improper interference with an HUD loan, the Fentises meet this test. Indeed, the Fentises are in a similar position to other parties who have been held to have standing under the Act. Dirden v. Department of Housing and Urban Dev., 86 F.3d 112, 114 (8th Cir.1996) (landowner attempting to sell property allowed to state a claim under the Act alleging discriminatory intent in city housing authority's refusal to negotiate); Oak Ridge Care Ctr., Inc. v. Racine County, 896 F.Supp. 867, 873 (E.D.Wis.1995) (seller of elderly care facility under existing nonconforming use agreement has standing under the Act); United States v. Scott, 788 F.Supp. 1555, 1561 (D.Kan.1992) (sellers of property who lost sale because of discriminatory practices have standing).
 
 
 22
 The City attempts to distinguish this case because the district court dismissed that portion of Fentises' complaint based on the City's alleged interference with the loan to ACOF. To the extent the complaint alleges that the City violated the Act by failing to approve the loan, the City argues, that cause of action can only survive if we hold that a discretionary funding decision may fit within the parameters of the Fair Housing Act. We disagree. The allegation here is not that the City violated the Act by failing to approve the ACOF loan, but that it improperly interfered with the loan ACOF needed to purchase the Fentises' property.
 
 
 23
 While the City is under no duty "to construct, to 'plan for, approve and promote' any housing," see Acevedo v. Nassau County, 500 F.2d 1078, 1082 (2d Cir.1974), the City does have a duty to act in a non-discriminatory manner. See Huntington Branch, N.A.A.C.P. v. Town of Huntington, 844 F.2d 926 (2d Cir.1988) (holding that town violated Act by rejecting proposal to construct subsidized housing in primarily white neighborhood when its proffered reasons were unconvincing), review denied in part and judgment affirmed, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), rehearing denied, 488 U.S. 1023, 109 S.Ct. 824, 102 L.Ed.2d 813 (1989). Because we read their complaint to allege discriminatory conduct, we hold that the Fentises state a claim under the Act.
 
 
 24
 Accordingly, we reverse the district court's dismissal of the Fentises' Fair Housing Act interference claim.[10]
 
 II
 
 25
 Legislators are entitled to "absolute common-law immunity against civil suits for their legislative acts, which is parallel to the immunity provided by the Speech or Debate Clause." Chappell v. Robbins, 73 F.3d 918, 920 (9th Cir.1996). In other words, legislators have absolute immunity when they "act in their legislative capacities, not in their administrative or executive capacities." Chateaubriand v. Gaspard, 97 F.3d 1218, 1220 (9th Cir.1996). In this circuit, we determine whether an act is legislative by considering two questions: (1) whether the act involves "ad hoc decisionmaking, or the formulation of policy;" and (2) whether the act applies "to a few individuals, or to the public at large." Chappell, 73 F.3d at 920; see also Bogan v. Scott-Harris, --- U.S. ----, ----, 118 S.Ct. 966, 972, 140 L.Ed.2d 79 (1998) ("Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities."). The district court's application of legislative immunity is a question of law reviewed de novo. See Trevino v. Gates, 23 F.3d 1480, 1481 (9th Cir.1994).
 
 
 26
 Under these factors, the district court correctly ruled that Councilman Svorinich is entitled to absolute immunity for "voting or persuading his colleagues to vote one way or another on approval of the loan to ACOF." See Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972) (holding that legislators are entitled to immunity when they take actions that are "an integral part of the deliberative and communicative process by which [legislators] participate in ... proceedings with respect to the consideration and passage or rejection of proposed legislation.").
 
 
 27
 Councilman Svorinich's actions regarding the proposed loan both involved the formation of policy applied to the public at large. The disbursement of public funds in support of one project necessarily means that other projects are not being funded. A legislator's decision can almost always be criticized for not funding some worthy group. This is precisely the type of decision for which a legislator must be given immunity. To hold otherwise would expose virtually every municipal funding decision to judicial review.
 
 
 28
 Thus, we affirm the district court's conclusion that Svorinich is entitled to absolute immunity for his legislative acts.
 
 III
 
 29
 Next, we review the district court's grant of summary judgment in favor of the City and Councilman Svorinich on the retaliation claim. A dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is a ruling on a question of law reviewed de novo. See Cohen v. Stratosphere Corp., 115 F.3d 695, 700 (9th Cir.1997). A dismissal with leave to amend is also reviewed de novo. See Dumas v. Kipp, 90 F.3d 386, 389 (9th Cir.1996). If matters outside the pleadings are considered, the motion to dismiss is to be treated as one for summary judgment. See Keams v. Tempe Technical Institute, Inc., 110 F.3d 44, 46 (9th Cir.1997). A grant of summary judgment is reviewed de novo. See Waste Action Project v. Dawn Mining Corp., 137 F.3d 1426, 1428 (9th Cir.1998).
 
 
 30
 To state a claim for retaliation under the Fair Housing Act, the Fentises must show: (1) they were engaging in a "protected activity" either when they attempted to sell their property to ACOF to be used as a home for the mentally ill or when they told a reporter that they would sue the City to force approval of the loan to ACOF; (2) the subsequent investigations of the California Hotel were causally linked with the Fentises' exercise of their protected activities; and (3) they suffered some resulting damage. See 42 U.S.C. § 3617.
 
 
 31
 * The Fentises first challenge the summary judgment grant for the City on procedural grounds; specifically, by treating the City's Rule 12(b)(6) motion to dismiss as a "renewed" summary judgment motion without providing them adequate notice.
 
 
 32
 When a district court "looks beyond the pleadings in evaluating a Rule 12(b)(6) motion to dismiss, the motion must be treated as one for summary judgment under Rule 56." Grove v. Mead School Dist. No. 354, 753 F.2d 1528, 1532 (9th Cir.1985). In providing notice to the parties, "a district court need only apprise the parties that it will look beyond the pleadings to extrinsic evidence and give them an opportunity to supplement the record." Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1408 (9th Cir.1995).
 
 
 33
 Moreover, when a party is represented by counsel, not only may formal notice be unnecessary, a "represented party who submits matters outside the pleadings to the judge and invites consideration of them has notice that the judge may use them to decide a motion originally noted as a motion to dismiss, requiring its transformation to a motion for summary judgment." Grove, 753 F.2d at 1533. Considering all these factors, the Fentises had sufficient notice that the district court intended to treat this motion as one for summary judgment.
 
 B
 
 34
 Next, we review the district court's ruling that the record did not support the Fentises' retaliation claim against the City. We acknowledge there is some evidence which supports this conclusion. The undisputed record shows that, while the individual who called in the complaint regarding the California Hotel might have had an improper motive, the Slumhouse Task Force investigators were themselves unaware of this fact. Indeed, there is no evidence that the members of the Task Force bore any bias against the Fentises. Moreover, contrary to the Fentises' assertions about the unusual use of the Slumhouse Task Force, the undisputed evidence shows that the task force is regularly used in cases where there has been a significant history of violations--such as the California Hotel. Finally, that the Fentises actually spent over $40,000 to make repairs and that they did not deny some of the specific findings of the investigators (e.g., broken windows, cockroaches), undercuts their claim of retaliation.
 
 
 35
 Nonetheless, after reviewing the record, we believe that there are genuine issues of material fact which preclude summary judgment. For the purposes of this claim, it is irrelevant whether the Fentises were actually in violation of the housing code; it is only relevant whether the City acted in response to their proposed sale or threatened lawsuit. The timing of the investigations, the short amount of time given to the Fentises to make repairs, the participation of the Building and Safety Commissioner, the criminal prosecution, and the evidence suggesting that a city official may have been demoted for interceding on behalf of the Fentises cannot, on the current state of the record, be accepted as routine or condemned as evidence of invidious purpose. To the contrary, there are disputed facts from which a reasonable juror could find for either side. Thus, we reverse the district court's grant of summary judgment on this claim and remand for a trial on the merits.
 
 C
 
 36
 Finally, we consider the Fentises' argument that there are disputed material facts concerning Councilman Svorinich's role in the investigation which preclude summary judgment on the retaliation claim.[11] On this issue, the district court concluded that Svorinich had shown that he "was not a causal factor in causing the inspection by investigators from the Slum[house] Task Force of the [California] Hotel, the issuance of [civil] citations, and the subsequent issuance of criminal complaints ... against plaintiffs." We disagree.
 
 
 37
 The record includes a number of disputed material facts which could establish Councilman Svorinich's role in both the interference with and retaliation against the Fentises. In particular, the "no mental tenants" note on a letter from Svorinich's office to ACOF, evidence that the inspection was instigated by a complaint made by a woman close to Svorinich's office, and evidence that suggests that the Slumhouse Task Force was acting at the behest of Councilman Svorinich viewed in the light most favorable to the Fentises, suggest that there are genuine issues of material fact which make summary judgment on the retaliation claim--which would necessarily involve actions beyond normal legislative functions--for Councilman Svorinich inappropriate. See Waste Action Project, 137 F.3d at 1428.
 
 IV
 
 38
 The district court dismissed with prejudice all the Fentises' supplemental claims under 28 U.S.C. § 1367(c)(2), concluding that the "state law claims substantially predominate over the federal law claim[s]." The district court gave no reasons to support this conclusion nor did it specifically state that its dismissal "would most sensibly accommodate" the values of "economy, convenience fairness, and comity." Executive Software North America, Inc. v. U.S. Dist. Court, 24 F.3d 1545, 1554 (9th Cir.1994). We review the district court's refusal to exercise supplemental jurisdiction for an abuse of discretion. See Inland Empire Chapter of Associated Gen. Contractors v. Dear, 77 F.3d 296, 299 (9th Cir.1996).
 
 
 39
 We hold that the district court did not abuse its discretion by failing to provide reasons to support its conclusion. In Executive Software, this court examined 28 U.S.C. § 1367(c), the statute under which a district court can decline supplemental jurisdiction over pendent state law claims while it maintains jurisdiction over federal claims in the same case. Under this statute, a district court can decline jurisdiction under any one of four provisions.[12]
 
 
 40
 Reviewing this statute, this court distinguished the first three provisions from the fourth provision--exceptional circumstances. Thus, we held that a district court "must articulate why the circumstances of this case are exceptional...." Executive Software, 24 F.3d at 1557. This court did not discuss, nor do we require, any similar explanation for a district court's reasons when the district court acts under any of the first three provisions. Unlike the "exceptional circumstances" provision, the first three provisions codify most of the applications already recognized by courts. See id. at 1560. Thus, the district court did not abuse its discretion by failing to provide stated reasons for its dismissal under 28 U.S.C. § 1367(c)(2).
 
 
 41
 Nonetheless, in the interest of judicial economy, we invite and encourage the district court to reconsider its dismissal of the state claims in light of our holding that the Fentises have standing to sue both for interference and retaliation.
 
 V
 
 42
 We affirm the district court's dismissal of the Fentises' § 1983 claims. Unlike the liberal pleading requirements available under the Fair Housing Act, 42 U.S.C. § 1983 requires a plaintiff to show that: (1) the conduct alleged was committed by an individual acting under color of state law; and (2) "the conduct deprived the plaintiff of a federal constitutional or statutory right." Wood v. Ostrander, 879 F.2d 583, 587 (9th Cir.1989).
 
 
 43
 The Fentises do not allege that they were deprived of any constitutional or statutory right. They have no standing to assert that the rights of the mentally ill have been violated by the City. With no alleged violation of their own rights and no standing to assert the rights of others, the Fentises have no claim under § 1983.
 
 
 44
 In addition, we reject the Fentises' substantive due process argument as the complaint fails to allege a right "addressed by other, more specific provisions of the Constitution." Armendariz v. Penman, 75 F.3d 1311, 1326 (9th Cir.1996).
 
 VI
 
 45
 An award of attorney's fees is generally reviewed for an abuse of discretion. See Wing v. Asarco, Inc., 114 F.3d 986, 988 (9th Cir.1997). This court reviews the supporting findings of fact for clear error. See Corder v. Gates, 104 F.3d 247, 249 (9th Cir.1996). Any element of legal analysis and statutory interpretations which figure in the district court's decision are also reviewed de novo. See Schwarz v. Secretary of Health & Human Servs., 73 F.3d 895, 900 (9th Cir.1995).
 
 
 46
 Under the Fair Housing Act, fees are awarded pursuant to 42 U.S.C. § 3613(c)(2).[13] See Keith, 858 F.2d at 486. The district court denied the Fentises' motion for attorney's fees on the grounds that: (1) the lawsuit lacked merit; and (2) that the lawsuit was not a cause of the City's approval of the loan. The district court's denial of attorney's fees was based on its dismissal of the interference claims under the Fair Housing Act and its grant of summary judgment on the remaining claims.
 
 
 47
 Because we reverse the district court on both those grounds, we vacate its denial of attorney's fees. The district court may wish to revisit this issue depending on the outcome of the trial on remand.
 
 CONCLUSION
 
 48
 We hold that the Fentises have standing under the Fair Housing Act to sue both for interference and retaliation. Although Councilman Svorinich is entitled to immunity for his legislative acts, he is not entitled to immunity for his alleged acts of retaliation. On the retaliation claim, we conclude that summary judgment was improvidently granted because of the clear existence of triable fact.
 
 
 49
 We affirm the district court's dismissal of the § 1983 claim and vacate the district court's denial of the Fentises' request for attorney's fees under the Act. Finally, we invite the district court to reconsider its dismissal of the state claims on remand.
 
 
 50
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED. Costs on appeal are awarded to Appellants.
 
 
 
 [1]
 The source of this funding is a matter of some dispute. The Fentises insist the money comes from federal sources while the City maintains that the money comes from the City itself. Although the record is unclear, it appears the funding at issue here comes from the United States Department of Housing and Urban Development ("HUD") in a plan administered by the City. Although the federal government is the actual source of the loan, the City is only allocated a certain amount of federal monies to be divided up among its various housing projects
 
 
 [2]
 Sometime prior to December 6, Svorinich's office sent a letter to ACOF discussing the various aspects of the project. The letter also contained an apparently inadvertent note hand-written by Svorinich's chief of staff stating "no mental tenants."
 
 
 [3]
 Svorinich was the only member of the Committee present at the meeting. The Fentises allege that his "vote" essentially killed "the project by halting [their] ability to use its H.U.D. funding."
 
 
 [4]
 The Slumhouse Task Force is a multi-agency group comprised of the Department of Building and Safety of Los Angeles, the Los Angeles Fire Department, and the Los Angeles County Department of Health. Rather than conduct initial inspections, the Slumhouse Task Force generally becomes involved in a case only after an initial investigation has been conducted and the cited party has not corrected the cited violations
 
 
 [5]
 The Fentises allege that the impetus for this search was numerous telephone calls placed by a local businesswoman close to Svorinich's office. There is also evidence suggesting that the inspection was done as a "favor" for Councilman Svorinich
 
 
 [6]
 The Fentises were given only 30 days to make most of the repairs, whereas in the past they had been given up to as much as a year to comply with repair orders
 
 
 [7]
 The record does not indicate the status of these charges
 
 
 [8]
 The district court had previously dismissed all of Fentises' state law claims under 28 U.S.C. § 1367(c)(2), concluding that the state law claims substantially predominate over the federal law claims. The Fentises unsuccessfully sought a writ in this court to review this dismissal. The Fentises now appeal the district court's dismissal
 
 
 [9]
 Although it concluded that the Fentises did not generally have standing to sue under the Act, it held that they did have standing to sue on the retaliation claim, see 42 U.S.C. § 3617. Accordingly, the district court dismissed this portion of the complaint with leave to amend
 
 
 [10]
 The district court previously held that the Fentises had standing to sue for retaliation under the Act. This ruling is not challenged on appeal and we do not disturb it
 
 
 [11]
 As discussed above, Svorinich is entitled to immunity for his legislative acts. His alleged acts of retaliation do not fit within the definition of "legislative" acts and therefore he is not immune from liability for those acts
 
 
 [12]
 The four provisions are:
 (1) the claim raises a novel or complex issue of State law,
 (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
 (3) the district court has dismissed all claims over which it has original jurisdiction, or
 (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).
 
 
 [13]
 The Fentises cannot recover attorney's fees under 42 U.S.C. § 1988 as their § 1983 claims have been dismissed